[Cite as *State v. B.C.*, 2021-Ohio-2682.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 110070 |
| v. | : | |
| B.C., | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 5, 2021

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-635036-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Gregory Paul, Assistant Prosecuting Attorney, *for appellee.*

Allison S. Breneman, *for appellant.*

LARRY A. JONES, SR., P.J.:

{¶ 1} Defendant-appellant B.C. appeals his convictions for several sexually oriented offenses. For the reasons that follow, we affirm.

## Procedural and Factual History

{¶ 2} In December 2018, B.C. was indicted in an eight-count complaint alleging he sexually assaulted two minor children. The indictment alleged that the first victim, A.C., was six or seven years old when she was assaulted by B.C. Relative to A.C., B.C. was indicted for two counts of rape in violation of R.C. 2907.02(A)(1)(b), two counts of attempted rape in violation of R.C. 2907.02(A)(1)(b) and 2923.02, one count of sexual battery in violation of R.C. 2907.03(A)(1), and one count of endangering children in violation of R.C. 2919.22(B)(1).

{¶ 3} The second victim was A.L.; it was alleged that she was assaulted by B.C. when she was three years old. The charges against B.C. relative to A.L. were one count each of gross sexual imposition in violation of R.C. 2907.05(A)(4) and endangering children in violation of R.C. 2919.22(B)(1).

{¶ 4} Seven of the counts in the indictment against B.C. contained a notice of prior convictions, repeat violent offender specifications, and sexually violent predator specifications.

{¶ 5} B.C. waived his right to a jury trial, and the matter proceeded to a bench trial where the following testimony was adduced.

**Testimony Relative to A.C.**

{¶ 6} The first victim, A.C., testified that, in 2017, when she was in her late teens and living in Tampa, Florida, she disclosed to her mother that she had been

sexually assaulted when she was six or seven years old by B.C., her paternal grandfather. A.C. and her mother went to the Tampa police the following day.

{¶ 7} A.C. testified that the sexual assaults occurred during the summer months when she was six to seven years old when her grandmother (B.C.'s wife) was babysitting her. The grandparents lived in a home on Mapledale Avenue in Cleveland. According to A.C., there were multiple incidents where she was sleeping in bed with her cousin, who was a toddler at the time, and B.C. would come in late at night and use his mouth and fingers to penetrate her vagina. A.C. testified that she never opened her eyes to see B.C., but she knew it was him because he came home from work late at night and was the only adult male who lived in the home at the time. She also knew it was B.C. because he was missing a portion of his thumb and his hands were rough. These nighttime incidents in bed happened "a lot," to the point that A.C. would sometimes dread going to sleep at her grandparent's house. A.C. testified that the incidents were physically painful.

{¶ 8} A.C. also testified about another incident that happened that same summer. She testified that B.C. laid her on his bed, pulled down her pants and underwear, and proceeded to take out his penis and put it on her face, then moved down to her vagina and then tried to put his penis inside her vagina. The incident happened upstairs, and there were other people downstairs. B.C. stopped with his assault because he heard someone coming upstairs.

{¶ 9} A.C. testified that her grandparents' house had an outdoor pool and she spent a lot of time in the pool that summer. She described another incident

when B.C. assaulted her when she had been hanging out at the pool. On that occasion, a male cousin, who was also at the pool, asked her to go upstairs to get him some shorts. A.C. testified that she dreaded going upstairs because she knew B.C. would be up there, but she went anyway. B.C. was in the room where A.C. had to go get the shorts; he said he was fixing a television. As A.C. came into the room, B.C. grabbed her by the arm and laid her on the bed the same way as the previous time described above. She was wearing a one-piece bathing suit, and B.C., who was positioned in front of her on his knees, moved the piece that was covering her private area and put his mouth and tongue on her vagina. A.C. testified that she was scared. The assault ended when her grandmother came upstairs looking for her. Upon finding A.C., her grandmother took her into another room and asked her if B.C. did anything to her. She told her grandmother "no" because she was afraid.

{¶ 10} A.C. testified to a final incident she had with B.C. A.C. told the court that there was a time when just she and B.C. were in the garage, and B.C. took out his penis and started "jacking off" in front of her.

{¶ 11} A.C. testified that she did not tell anyone what was happening to her at the time because she was too young to comprehend what was occurring.

{¶ 12} A.C.'s mother testified. She was a single mother who worked often, and when the family lived in Cleveland, she would allow her kids to be at the grandparents' home for weeks or months at a time, especially in the summer. After A.C. told her about the assaults, the mother recalled a time when A.C. was

about seven or eight years old and she was apprehensive about sitting on B.C.'s lap around Christmas time when he dressed up as Santa Claus.

{¶ 13} The grandmother and A.C.'s mother maintained phone contact after A.C. and her family moved to Tampa. A.C. and her family did not remain in contact with B.C., however.

{¶ 14} The grandmother also testified. According to the grandmother, B.C. owned a cleaning business and mostly worked nights; he would typically come home between midnight and 1:00 a.m. During the relevant time period, her grandchildren, including A.C., spent a lot of time at their house.

{¶ 15} The grandmother recalled the incident A.C. had previously testified to, where she found A.C. and B.C. alone in the bedroom. She went upstairs looking for A.C. and found her in a bedroom with B.C. A.C., in a bathing suit, was lying on the corner side of the bed and B.C. was leaning down by her side. The grandmother asked B.C. what he was doing, and he said he was fixing the television. The grandmother took A.C. to another room and asked if B.C. had touched her. A.C. said "no." The grandmother asked A.C. once more and A.C. again replied "no." The grandmother testified that she was not satisfied with A.C.'s responses, so she confronted B.C. and admonished him not to ever touch her grandchildren.

**Testimony Relative to A.L.**

{¶ 16} B.C.'s wife frequently babysat A.L. A.L. testified that when she was three years old, B.C. put his hands down the front of her pants and touched her

vaginal area.  A.L. explained that, although the incident happened when she was so young, she remembered it "because it's, like, something — something terrifying, something horrific.  It's, like, it doesn't matter really how old you are. It's just a memory that you will never forget."

{¶ 17}  A.L. and A.C. are not related, and A.L. had no recollection of ever meeting A.C.

**B.C.'s Testimony**

{¶ 18}  According to B.C., at the time these offenses occurred, until mid-2008, his 60-year-old, drug-addict brother was living with them.  B.C. testified that he worked a lot of hours during that time frame and would not come home from work until 5:30 or 6:00 in the morning almost every day.  Further, according to B.C., at the time that A.C. alleged that he exposed himself to her in the garage, the garage was in complete disrepair and was falling over.  B.C. denied that he engaged in untoward conduct with either A.C. or A.L.

{¶ 19}  B.C. and his wife separated in 2011.  There was a lot of animosity between the two and, according to B.C., his wife had threatened to send him to jail for leaving her and would not allow him to see his children.  With the exception of attending their son's graduation, B.C. and his wife did not have contact with one another.

**Verdict and Sentence**

{¶ 20} After its deliberation, the trial court found B.C. guilty as indicted. The trial court sentenced him to life without parole. B.C. now appeals, raising the following assignments of error for our review:

> Assignment of Error I: The judge found, against the manifest weight of the evidence, that the appellant committed the acts alleged in the indictment.

> Assignment of Error II: The evidence was not legally sufficient to sustain a guilty verdict.

## Law and Analysis

{¶ 21} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph two of the syllabus. As a matter of appellate review, they involve different means and ends. *Id.* at 386-389. They also invoke different inquiries with different standards of review. *Id.*; *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In the simplest sense, the difference is that sufficiency tests the burden of production while manifest weight tests the burden of persuasion. *Thompkins* at 390 (Cook, J., concurring).

{¶ 22} Sufficiency is a question of law. *Id.* at 386; *Smith* at *id.* If the state's evidence is found to have been insufficient as a matter of law, then on appeal, the court may reverse the trial court. *Thompkins*, at paragraph three of the syllabus, citing Ohio Constitution, Article IV, Section 3(B)(3). Under this construct, the state would have failed in its burden of production, and as a matter of due process,

the issue should not even have been presented to the jury. *Thompkins* at 386; *Smith* at *id.*

{¶ 23} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, an appellate court does not conduct an exhaustive review of the record, or a comparative weighing of competing evidence, or speculation as to the credibility of any witnesses. Instead, the appellate court presumptively "view[s] the evidence in a light most favorable to the prosecution." *Jenks* at *id.*

{¶ 24} Manifest weight is a question of fact. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. If the trial court's judgment is found to have been against the manifest weight of the evidence, then an appellate panel may reverse the trial court. *Thompkins* at *Id.* Under this construct, the appellate court "sits as the 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Id.*

{¶ 25} In a manifest weight analysis, an appellate court "reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and * * * resolves conflicts in the evidence." *Id.* "A court reviewing questions of weight is not required to view the evidence in a light most favorable to

the prosecution, but may consider and weigh all of the evidence produced at trial." *Id.* at 390 (Cook, J., concurring). "The weight to be given the evidence and the credibility of witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶ 26} An appellate court may not merely substitute its view for that of the jury, but must find that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* at 387; *see also id.* at 390 (Cook, J., concurring) (stating that the "special deference given in a manifest-weight review attaches to the conclusion reached by the trier of fact."). Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 387.

{¶ 27} Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency when conducting the analysis; that is, a finding that a conviction was supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *Id.* at 388. In the present case, manifest weight is dispositive.

{¶ 28} In support of his contention that his convictions are against the manifest weight of the evidence, B.C. questions the allegations made by A.C. and contends that "the variances in when and where these allegations occurred are too weak to sustain a guilty verdict." We disagree.

{¶ 29} From her initial disclosure in 2017, A.C. has consistently stated the manner and methods B.C. used to sexually assault her. Specifically she has maintained that she was six to seven years old and that the incidents all occurred at her grandparents' house. Further, A.C. described the physical pain the incidents caused her, as well as sensory details like the roughness of B.C.'s hand and the fact that B.C. was missing a portion of his thumb.

{¶ 30} Likewise, A.L. maintained that she was three years of age when B.C. sexually assaulted her by putting his hand down the front of her pants. She testified that she remembered the encounter, despite her young age, because it was a "horrific" memory, and one she will never forget. Significantly, there is no indication in the record that A.C. and A.L. had ever met and, thus, there is no evidence tending to suggest that they conspired to conjure up the incidents.

{¶ 31} And despite B.C.'s insinuation to the contrary, the record does not support that A.C.'s grandmother (B.C.'s ex-wife) conspired with A.C. and her mother to manufacturer the incidents in revenge for their failed relationship. The record demonstrates that B.C. and his wife separated in 2011, and with the exception of their son's graduation two years before the time of trial, the wife had not seen or spoken to B.C. The court opted not to believe B.C.'s suggestion that this was all a plot to get revenge on him — a choice that it is not incredible.

{¶ 32} In light of the above, the weight of the evidence supports the convictions; thus, the evidence was also necessarily sufficient to support the

convictions. B.C.'s two assignments of error are therefore without merit and hereby overruled.

{¶ 33} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., PRESIDING JUDGE

KATHLEEN ANN KEOUGH, J., and
EILEEN T. GALLAGHER, J., CONCUR